425 So.2d 608 (1982)
Thomas Miacle STANLEY, by and through His Parents and Natural Guardians, Lynn W. Stanley and Miacle I. Stanley, and Lynn W. Stanley and Miacle I. Stanley, Individually, Appellants,
v.
UNITED STATES FIDELITY & GUARANTY CO., St. Vincent's Medical Center, Florida Physicians Insurance Reciprocal, J. Eugene Glenn, M.D., P.A., James Eugene Glenn and the Florida Patient's Compensation Fund, Appellees.
No. AH-500.
District Court of Appeal of Florida, First District.
December 29, 1982.
Rehearing Denied February 8, 1983.
*609 James T. Terrell of Brown, Terrell & Hogan, P.A., Jacksonville, for appellants.
James C. Rinaman, Jr., and Nick V. Pulignano, Jr., of Marks, Gray, Conroy & Gibbs, Jacksonville, for appellees James Eugene Glenn, J. Eugene Glenn, M.D., P.A., and Fla. Physicians Ins. Reciprocal.
James H. McCarty, Jr., of Boyd, Jenerette, Leemis & Staas, P.A., Jacksonville, for appellees U.S. Fidelity & Guar. Co. and St. Vincent's Medical Center.
L. Haldane Taylor, Jacksonville, for appellee Fla. Patient's Compensation Fund.
ROBERT P. SMITH, Jr., Chief Judge.
Plaintiffs appeal from a judgment entered upon a jury verdict for the defendants in this medical malpractice action. Plaintiffs' claim against the obstetrician and hospital, on account of retardation and cerebral palsy suffered by infant Tommy Stanley since birth, was that the medical defendants negligently failed to diagnose and effectively remedy the infant's oxygen deprivation just before birth. The defendants denied that and advanced the theory, supported by expert testimony and other proof, that the child's abnormalities are congenital.
Of plaintiffs' 12 points on appeal, few have substance but one is decisive. We hold that the jury's verdict for the defendants was tainted by evidence they improperly adduced to show that the special therapy and education required by the minor plaintiff, as a result of his condition however caused, is available to his family from charitable or governmental sources at little or no cost. The judgment must therefore be reversed and the case remanded for a new trial.
The collateral source doctrine of course "permits an injured party to recover full compensatory damages from a tortfeasor irrespective of the payment of any element of those damages by a source independent of the tortfeasor."[1] A corollary of that rule of recovery is one of evidence, excluding proof of collateral payments or other benefits that cannot reduce the tortfeasor's responsibility even though they may in fact inure to plaintiff's benefit. E.g., Paradis v. Thomas, 150 So.2d 457 (Fla. 2d DCA 1963).
Despite a defendant's verdict on liability, formally representing that the jury never reached damage issues, the erroneous admission of collateral source evidence has been held in certain circumstances to require a new trial because the evidence had a highly prejudicial effect. E.g., Cook v. Eney, 277 So.2d 848, 850 (Fla. 3d DCA 1973), cert. den., 285 So.2d 414 (Fla. 1973) ("The admission of evidence of receipt of [social security and workers' compensation] benefits may indeed have led the jury to believe that appellant was trying to obtain a double or triple payment for one injury."); Williams v. Pincombe, 309 So.2d 10, 11 (Fla. 4th DCA 1975) ("Such evidence [of welfare benefits] had the tendency to confuse and mislead the jury on the issue of the defendant's liability and its admission by the trial court constituted error prejudicial to the plaintiff.")
*610 Proving damages, plaintiffs' counsel put on testimony by Dr. Buda, a pediatric neurologist, that the Stanley child would need physical therapy for life at a cost of up to $120 per month and speech therapy for several years at a cost of up to $120 per week. Over plaintiffs' objection, the defendant physician's counsel cross-examined Dr. Buda concerning the availability of the necessary treatment at reduced cost, or no cost at all, through local charities, public schools, and the like. In the main, Dr. Buda stuck to his opinion that private therapy was the better course, because of its quality and its assured availability, but to some extent he conceded the availability and usefulness of those local publicly or charitably funded programs. These excerpts fairly summarize the cross-examination questions and answers:
Q. And Baby Stanley has been availing himself of the services of that Cerebral Palsy Clinic on four or five or six occasions with a grown-up, so far?
A. He has been seen in the clinic.
.....
Q. How is that organized? It's located at the Nemours Hospital, the old Hope Haven Hospital?
A. For the moment, but I'm afraid it's going to have to move because of space problems.
Q. How is it sponsored?
A. The Cerebral Palsy Foundation that allocates money to the communities.
Q. A national health organization?
A. I believe so. I really couldn't make an accurate statement as to where its funding comes from.
Q. Do they get money from other organizations, like the March of Dimes and people like that?
A. I wouldn't know. I don't know how they get their funds.
Q. It operates in the community and other communities  what other kind of funding do they have, do you know?
A. I don't know how they are funded.
.....
Q. The Cerebral Palsy Clinic is available to the public and available to Mr. and Mrs. Stanley to provide monitoring of his condition and recommend treatment and make continuing diagnosis of the baby as he grows up?
A. Right.
.....
Q. There would be no charge for those services?
A. I don't know  when you say no charge, whether they have a sliding scale or what.
.....
Q. Does the Speech and Hearing Clinic have speech therapy like that you suggest Baby Stanley would need?
A. It depends on the Speech and Hearing Clinic. Some of them are funded and some of them are not.
Q. Well, is this one in Jacksonville funded?
A. The one I know best is the one on Laura Street. That is not funded.
Q. Are there others in town?
A. One can get speech therapy at other agencies, but as far as the Speech and Hearing Clinic, the one I know of on Laura Street, that is not funded.
Q. These are public health agencies and public health facilities that are available to the general public. They are not welfare or anything like that. They are there to provide a service for people who need that particular kind of service?
A. Right.
Q. And those programs are available to the public for nothing or for some sort of sliding scale?
.....
A. It mainly depends on the parents' income level, whether or not they qualify for completely funded program or whether they have a bill based on a sliding scale.
Q. Okay. And the same would be true on physical therapy that you told us about?
A. Sure.

*611 Q. The same would be true as to educational facilities for special children's care, which is available through the public school system of Duval County?
A. Right. The public school system does have some special education schools.
Q. Right. And these schools are dedicated to taking care of cerebral palsy babies and other kinds of children who are growing up with disabilities?
A. Yes.
Q. That are the same as, not as bad as or worse than Baby Stanley?
A. Yes sir, disability similar to the Stanley baby.
Again, plaintiffs' counsel sought to prove through Dr. Reynolds, a clinical psychologist, that because of cerebral palsy and related disabilities the Stanley child would require "learning stimulation" for several hours a week, outside of normal school hours, by trained therapists. This the witness testified would cost $25 to $35 per hour. Again on cross-examination the defendant physician's counsel showed that local charitable sources could provide the needed special educational care:
Q. In Jacksonville, Doctor, the Cerebral Palsy Clinic, the Speech and Hearing Clinic and various schools available in the Duval County School System as well as ... various foundations and health groups provide the sort of services that Tommy needs...; is that correct? ...
A. That is correct. There are facilities available.
Q. And those facilities to the Stanley family would be available free of charge or at nominal charge?
A. They are generally funded by governmental sources or 
Q. And also foundations like Nemours Foundation?
A. That's correct.
Q. And also foundations like the March of Dimes and the Cerebral Palsy Foundation and groups like that?
A. That is correct.
Q. And that is what they are there for is to take care of people who have these problems, really, regardless of their financial resources; is that right?
A. That's correct.
Q. There are specialists there who specialize in just people like Tommy Stanley?
A. That's correct.
Q. And specialists around this community who provide their services to those clinics even though they are in private practice and doing their own private money-making work in the regular life?
A. Well, they have people on staff. They have various specialties on staff in some regards.
Q. They have consultants who volunteer their time to help out the full-time staff, is that correct, different specialists?
A. There are such individuals, yes.
Q. And that has been done for years and years and years in Jacksonville?
A. So far as I know.
On redirect examination, Dr. Reynolds confirmed that "Government programs come and they go," depending on funding.
The questioning of Drs. Buda and Reynolds about governmental and charitable sources of treatment was explained by the defendant physician's counsel at the outset of his summation to the jury. He argued, without further objection by plaintiffs' counsel:
That is this question of sympathy. This question of the availability of services in the community, which I tried to bring out, because I knew [you] ... had no familiarity whatever with any of that and knew nothing about the Cerebral Palsy Clinic, the Speech and Hearing Clinic ..., the Nemours Foundation . .., the March of Dimes and Birth Defects... . That was not to show that you should not award damages to Tommy... . It was so that you won't go back into that jury room feeling a burden that this poor baby, whatever his problem is and ... is going to be  can't be taken care of by his family and can't be taken care of in this community unless you give him the money... . I hope that I have shown you that Tommy can be taken care *612 of in our community and that money damages aren't the key to whether or not he can be taken care of. I have shown you that there are facilities for that purpose which is not to say ... that if you find that Dr. Glenn or the hospital were guilty of negligence and that negligence caused Tommy Stanley's problems, that you should not find damages for Tommy Stanley because of those services.
This cross-examination and argument offended the policies reflected in the collateral source rule and in the precedents enforcing that rule. If plaintiffs were entitled to recover at all, they were entitled to recover the reasonable cost or value of the therapy and education indisputably required, without reduction in the verdict on account of the family's access to charitable or governmental programs at less cost, or no cost. The cross-examination and testimony showing those alternative programs should have been excluded.
This principle of law exists independently of section 768.50, Florida Statutes (1981), which codifies the collateral source rule for some purposes, and for those purposes only, in medical malpractice cases. That statute requires the damages assessed by medical malpractice verdicts to be reduced "by the total of all amounts paid to the claimant from all collateral sources which are available to him." Sec. 768.50(1), Fla. Stat. (1981). But "collateral sources" are particularly defined "[f]or purposes of this section" to mean "any payments made to the claimant, or on his behalf, by or pursuant to" specified financial sources[2] including, most arguably pertinent to this case, "public programs providing medical expenses, disability payments, or other similar benefits." Sec. 768.50(2)(a), Fla. Stat. (1981).
For two reasons the statute is inapplicable here. First, the statute addresses only evidence of "payments" to claimant or for his benefit; the statute does not address in-kind benefits that claimant may have received, such as medical treatment, special education, or therapy professionally administered to him either by volunteers or by paid staff of a governmental or charitable institution. The statutory scheme being that the trial judge will simply tally the liquidated "payments" made to or for claimant, and subtract the total from the verdict upon entering judgment, the difficulty of evaluating in-kind collateral benefits may have seemed to the legislature reason enough to exclude in-kind benefits from the calculations reducing claimant's recovery. At any rate unliquidated in-kind benefits were excluded.
Second, the statute addresses only those collateral benefits that "have been paid" to claimant at the time of the post-verdict calculation; the statute does not require the court to predict and tally future collateral benefits, so to subtract them from the verdict. That omission, too, may reflect a legislative judgment that calculating future collateral benefits is difficult, if not impossible. At any rate all problems concerning future benefits were decisively avoided, for the 1977 legislature struck from the 1976 statute its references to amounts "to be paid" and amounts that "will be paid" from collateral sources. Ch. 77-64, § 7, Laws of Fla., amending sec. 768.50(1), Fla. Stat. (1976 Supp.).
*613 Thus, future governmental and charitable services to the Stanley child, in the form of low-cost special education, therapy, and the like, are not "collateral source" payments within the meaning and application of section 768.50. It does not follow, however, that they are not collateral source benefits excludable from evidence under the common law rule. There is no reason to suppose that the legislature, enacting section 768.50, intended to codify an exclusive rule and to circumscribe its common law effect, so now admitting evidence during a conventional medical malpractice trial of collateral source benefits of a type the statute does not designate for post-verdict calculation. For example, we doubt that the statute intends, by not including a neighbor's gift of personal nursing care on the list of "collateral sources," that the neighbor's kindness should now go to reduce awardable damages for "the reasonable value or expense of medical and nursing care and treatment necessarily or reasonably obtained by (claimant) in the past or to be so obtained in the future." Fla.Std.Jury Instr. (Civ.) 6.2c.
We now turn to the question of whether this cross-examination was foreclosed by the collateral source rule conceived independently of section 768.50. The collateral sources proved in this case  Jacksonville's Cerebral Palsy Clinic, Speech and Hearing Clinic, and March of Dimes agencies  seemingly are available, at least as far as their resources go, to any and all members of the public. In this general availability those benefits are different from collateral benefits that are very tangibly paid for or earned by the recipient, such as insurance,[3] disability income,[4] workers' compensation,[5] Social Security,[6] Medicare[7] and the like. The idea that the collateral benefits were earned by the injured plaintiff, not by the tortfeasor, is typically expressed by Paradis v. Thomas, supra, approving plaintiff's recovery for the value of "free" governmental medical services plaintiff received as a member of the armed services. Quoting other authorities, the opinion states:
[I]t might well be considered that medical and hospital services supplied by the Government to these members of the United States Navy were part of the compensation to them for services rendered, and therefore that by their service in the Navy they had paid for these. [quoting Burke v. Byrd, 188 F. Supp. 384 (N.D.Fla. 1960)].
Where a person has been disabled and hence cannot work but derives an income during the period of disability from a contract of insurance or from a contract of employment which requires payment during such period, his income is not the *614 result of earnings but of previous contractual arrangements made for his own benefit, not the tortfeasor's. [quoting Restatement of Torts § 920, comment e].
Paradis, like so many other authorities, thus emphasized plaintiff's special deserving of the collateral benefit, as something earned, when denying credit to the tortfeasor. But here the case is different, and if the Paradis reasoning is necessary to justify the collateral source rule, the rule lacks moral force here. For it is because the Cerebral Palsy Clinic is charitably subsidized, not because the Stanleys have in some way prepaid for the advantage, that the Clinic will treat the Stanley child for less than the commercial market price.
While plaintiff's special deserving adds justification for the collateral source when that factor is present, it is not indispensable. For the dominant purpose of the rule is to deny the tortfeasor a windfall credit reducing his monetary responsibility on account of benefits the victim received, however funded, from a source independent of the tortfeasor. As this Court said in Walker v. Hilliard:[8]
If there must be a windfall, it is more just that the injured party profit, rather than the wrongdoer be relieved of full responsibility from his wrongdoing.
See also Janes v. Baptist Hospital of Miami, Inc., 349 So.2d 672, 673 (Fla. 3d DCA 1977), cert. den., 355 So.2d 512 (Fla. 1978); Restatement (Second) of Torts, § 920A; Fleming, The Collateral Source Rule and Loss Allocation in Tort Law, 54 Calif.L.Rev. 1478, 1483 (1966).[9]
In this case two additional factors strengthen the case for excluding the collateral source evidence. One is that the continued availability of the programs alluded to is a matter of conjecture. They depend, as do all governmental and charitable programs, on the vicissitudes of taxing or donations, program preferences and budget priorities. As quoted earlier, one witness said precisely that about the Speech and Hearing Clinic: "[T]he one I know of on Laura Street, that is not funded." The other witness acknowledged that "Government programs come and they go." Thus neither the testimony nor our common experience[10] permits us to say with any assurance, as defendant's counsel said in argument to the jury, "Tommy can be taken care of in our community and ... money damages aren't the key to whether or not he can be taken care of."
Secondly, if liability is established, the verdict's purpose is to assess the money required for recompense. Beyond that, whatever confidence the jury may have in the programs and personnel of Jacksonville's Speech and Hearing Clinic and Cerebral Palsy Clinic, the verdict cannot legitimately dictate that the Stanleys resort to those specialists, rather than to others in the private sector, to minister to this child in his youth and beyond. These defendants, an obstetrician and a hospital who presumably charge competitive rates for their services, can attest that no law compelled the Stanleys to resort to charities or government for the medical care needed during Mrs. Stanley's pregnancy and delivery; just so, no law now consigns the Stanleys to those sources for the needed pediatric care. Most people, having the ability to pay, prefer *615 private care.[11] Therefore, even those commentators who would award no damages for past medical care that was in fact charitably provided, would award full value for the same medical care in the future, thus preserving claimant's future choice at the tortfeasor's expense. Professor Sedler, for example, would "deny recovery to the plaintiff" for the value of services previously received at a public or private charity hospital, "since as to him such care was free, and there is no reason to permit him to be able to recover the cost from the defendant." He continues:
Whether the hospital should be able to recover from the tortfeasor is a different matter, but in all probability it is not worthwhile for them to pursue such claims. The plaintiff should be able to recover the cost of future medical services, since he is likely to prefer private care, and it is his "right" to have it. It may be that he will employ the free care for which he is eligible and thereby receive a "windfall," but recovery for past and future expenditures must be had in a single action, and at the time of suit there is no way of knowing what he will choose to do.
Sedler, The Collateral Source Rule and Personal Injury Damages: The Irrelevant Principle and the Functional Approach, 58 Ky.L.J. 161, 186 (1970).
For the reasons stated, we conclude that it was error to permit cross-examination showing that therapy and special education was available to the Stanley child "for nothing or for some sort of sliding scale," depending on income, from charitably or publicly funded agencies. We now must address the question of whether the error was of such a character as to require a new trial.
A superficial reading of the decisions would seem to suggest that admitting collateral source evidence is per se prejudicial to a fair trial on liability, akin perhaps to a prosecutor's comment at a criminal trial on the accused's failure to testify. Certainly the decisions of recent years have almost uniformly ordered new trials. Kreitz v. Thomas, 422 So.2d 1051 (Fla. 4th DCA 1982); Clark v. Tampa Electric Co., 416 So.2d 475 (Fla. 2d DCA 1982); Williams v. Pincombe, 309 So.2d 10 (Fla. 4th DCA 1975); Cook v. Eney, 277 So.2d 848 (Fla. 3d DCA 1973), cert. den., 285 So.2d 414 (Fla. 1973). But cf., Grossman v. Beard, 410 So.2d 175 (Fla. 2d DCA 1982).[12] In each of those cases, however, the collateral source evidence had a specific and articulable propensity for genuine prejudice on liability issues, either suggesting that claimant was already fully compensated for his injury or tending to defame claimant's motives or general verdict-worthiness.
Thus, Kreitz was an automobile accident case in which defendant's liability depended on plaintiff proving, as claimed, that he *616 sustained "a relatively small permanent injury." The collateral source evidence of workers' compensation benefits was found to be prejudicial to the liability issue because, "the issue being close," the jury might "very well ... have concluded that the Workers' Compensation benefits were sufficient recompense... ." 422 So.2d at 1052.
In Clark, the collateral source payments were not actually evidenced, but were hinted at by cross-examination inquiring whether plaintiff "was making more money now that he was disabled," through disability income, social security and worker's compensation, "than when he was employed." Though the evidence was plausibly relevant to show that plaintiff "was malingering for financial gain," the cross-examination was disallowed and the trial judge admonished the jury not to consider collateral source payments. After a verdict of no liability, the district court reversed for a new trial, saying "the jury may well have concluded that appellants were already quite financially well off and needed no additional recovery from appellee." 416 So.2d at 477.
In Williams, the defendants were permitted to prove, "for the purpose of impeaching the plaintiff's testimony regarding her motivation to return to work," that plaintiff received welfare benefits on account of her dependent children for two years before the accident and, apparently, continuously until the trial. Though the collateral source rule would perhaps not be strictly applicable to welfare for dependent children paid before the accident, the court reversed the no-liability judgment for defendant and required a new trial, quoting Cook to the effect that "there generally will be other evidence having more probative value and involving less likelihood of prejudice than the victim's receipt of insurance-type benefits." 309 So.2d at 11.
In Cook, a medical malpractice case, the court reversed a no-liability judgment because evidence of social security and workers' compensation payments was admitted to rebut plaintiff's testimony "concerning his motivation and desire to return to work." 277 So.2d at 849. The court, noting persuasive authority elsewhere[13] to the effect that collateral source evidence is "likely to influence the jury against the plaintiff on the issues of liability or damages," stated:
It cannot be said with any degree of certainty that the jury did not determine that since the appellant was otherwise being taken care of, there should be no recovery against appellee in tort. The admission of evidence of receipt of other benefits may indeed have led the jury to believe that appellant was trying to obtain a double or triple payment for one injury. [277 So.2d at 850].
Obviously there are significant differences between this case and those we have discussed. Here any influence of the erroneously admitted evidence upon the no-liability verdict was more subtle. No merciful jury could have thought the charitable or governmental care so problematically evidenced in this case was of a value wholly equivalent to the child's loss due to the alleged negligence. Nor did this evidence carry a "sting" in addition to its face value, as by attributing duplicity, greed, or some other such motive to the plaintiffs.
There is some difficulty, then, in describing a specific analytical link between the improper evidence and the no-liability verdict in this case. In the final analysis, however, we are influenced by two factors to order a new trial: first, because the burden must be upon the defendants to show that the improper evidence did not *617 influence the no-liability verdict, not upon the plaintiffs to show the contrary; and second, because counsel for the defendant physician thought the link sufficiently evident, and sufficiently strong, to merit a prominent place in his summation.
Determining the actual effect of improper collateral source evidence is necessarily a speculative matter. That difficulty is no doubt at the root of decisions, such as Cook, that imply where the burden lies by such recitals as: "It cannot be said with any degree of certainty that the jury did not determine...."[14] Placing the risk of non-persuasion on the party who sought the benefit of the improper evidence is in accord with the general proposition, recently relied on by this Court in Schilpp v. Schilpp, 380 So.2d 573, 576 (Fla. 1st DCA 1980), that "[w]here, as here, clear error is made to appear, injury is presumed to follow, unless the record affirmatively shows to the contrary." The defendants have not persuaded us that their evidencing the availability of low-cost charitable therapy had no influence on the jury's liability deliberations in this case, closely contested as it was.
The actual linkage between the improper evidence and the no-liability verdict is best demonstrated, if it must be, by the closing argument of able counsel for the defendant physician. Earlier, when on proffer the admissibility of the evidence was debated, defendants' counsel and the court concurred in describing the evidence as going to the issue of "what is the reasonable cost of caring for this child." The court further explained, addressing plaintiffs' counsel:
Mr. Terrell, I anticipate that you are going to put up on a flip chart before we are finished on argument, $120 times twelve months times the life expectancy of seventy-six years and multiply it out. It's going to be millions of dollars, and I believe that in fairness, essential fairness, counsel should indicate that that may not be the reasonable cost of the kind of treatment that this person needs.
That description of the evidence, and its pertinence only to damage issues, is to be contrasted with its significance as described to the jury later, in the defendant physician's summation: "I hope that I have shown you that Tommy can be taken care of in our community and that money damages aren't the key to whether or not he can be taken care of."
We readily acknowledge, as indicated in the full text of his argument quoted earlier in this opinion, that counsel ladened his message with cautions, disclaimers and qualifiers, so not to insist too much that the evidence was pertinent to liability. Nevertheless, the difference between what was asserted by counsel's argument, and what was disclaimed or reserved, is too small to measure. We cannot say that counsel's argument did not affect the jury as he intended it should.
Other possible irregularities in the trial, not amounting to error but producing some grounds for complaint  such as the questionable authentication of the auditory-evoked response test documents  will no doubt be cured at retrial.
The judgment is REVERSED and the case is REMANDED for a new trial.
McCORD and MILLS, JJ., concur.
NOTES
[1] This comprehensive definition introduces an equally comprehensive discussion of the subject in 3 M. Minzer, J. Nates, C. Kimball, D. Axelrod, R. Goldstein, Damages in Tort Actions § 17.00 at p. 17-5 (1982) [hereinafter cited as Minzer et al.].
[2] Section 768.50(2) provides that, "for purposes of this section,"

(a) "Collateral sources" means any payments made to the claimant, or on his behalf, by or pursuant to:
1. The United States Social Security Act; any federal, state, or local income disability act; or any other public programs providing medical expenses, disability payments, or other similar benefits.
2. Any health, sickness, or income disability insurance; automobile accident insurance that provides health benefits or income disability coverage; and any other similar insurance benefits, except life insurance benefits available to the claimant, whether purchased by him or provided by others.
3. Any contract or agreement of any group, organization, partnership, or corporation to provide, pay for, or reimburse the costs of hospital, medical, dental, or other health care services.
4. Any contractual or voluntary wage continuation plan provided by employers or any other system intended to provide wages during a period of disability.
[3] Walker v. Hilliard, 329 So.2d 44 (Fla. 1st DCA 1976); Allstate Mortgage Corp. v. Alpha Motors, Inc., 294 So.2d 100 (Fla. 3d DCA 1974), cert. den., 303 So.2d 640 (Fla. 1974).
[4] Clark v. Tampa Electric Co., 416 So.2d 475 (Fla. 2d DCA 1982).
[5] Clark v. Tampa Electric Co., supra note (4); Grossman v. Beard, 410 So.2d 175 (Fla. 2d DCA 1982); Cook v. Eney, 277 So.2d 848 (Fla. 3d DCA 1973), cert. den., 285 So.2d 414 (Fla. 1973); Gates & Sons, Inc. v. Brock, 199 So.2d 291 (Fla. 1st DCA 1967), cert. den., 204 So.2d 328 (Fla. 1967). In actions subject to the Florida Automotive Reparations Reform Act, workers' compensation benefits are specifically excluded from collateral source benefits which are to be shown to the jury and deducted from the damage verdict. Sec. 627.7372(3), Fla. Stat. (1981). In that Act the general definition of "collateral sources" is the same as in § 768.50(2)(a), here involved.
[6] Clark v. Tampa Electric Co., supra note (4); Cook v. Eney, supra note (5).
[7] Janes v. Baptist Hospital of Miami, Inc., 349 So.2d 672 (Fla. 3d DCA 1977), cert. den., 355 So.2d 512 (Fla. 1978). See also 3 Minzer et al., supra note 1, § 17.23 at pp. 17-76, 77:

The collateral source rule generally permits an injured person to recover full damages without regard to benefits paid by Social Security and its subsidiary Medicare and Medicaid programs. Social Security and Medicare benefits have been likened to payments under private insurance plans, since they will ordinarily have been at least partially financed by contributions from the recipients in the form of employee taxes. Similarly, Medicaid has been described as a system of social insurance, although in operation it more closely resembles a system of public welfare under which benefits do not depend on contributions.
[8] Walker v. Hilliard, supra note 3, 329 So.2d at 45. As that was a case of property damage, compensated by insurance bought by the plaintiff, the Court added that "there is no privity" between the wrongdoer and the insurer, and "the policy was written for the benefit of the insured, not for the wrongdoer."
[9] 54 Calif.L.Rev. at 1483:

The constantly recurring refrain, with strong overtones of moral outrage, is that the defendant should not be "let off" from any portion of what is his due by the exertions and foresight of his victim or those who stood by him in his hour of need.
[10] 3 Minzer et al., supra note 1, § 17.44[1], at p. 17-217:

Uncertainty as to the actual future receipt of gratuitous government aid offers an additional argument favoring application of the collateral source rule, especially where the provision of benefits depends on a succession of administrative decisions over an undeterminable period of time.
[11] In the proffer, to a greater degree than before the jury, the qualitative differences between private and public medical care, of the nature required, was described by Dr. Buda:

A. But you have to realize that there is a variation in the type of services they are given.
Q. Right. In other words, if you had the money to spend the money that you are talking about, you could go to a private physician for private speech and hearing, especially for private therapy and get a higher quality or better attention?
A. That is true.
Q. But there are basic fundamental good adequate services available to the public in these institutions; is that correct?
A. I would say that there are services available. I don't know if I would take all your qualifiers.
[12] Grossman is a variation from the norm requiring a new trial on liability for an error in admitting collateral source benefits. Plaintiffs claimed damages including the cost of extensive psychiatric treatment. The trial court admitted evidence of workers' compensation benefits paying plaintiff's bills because defendant was prepared to prove that "this type of psychiatric treatment is ineffective unless the patient bears the expense of treatment... ." 410 So.2d at 176. The district court held the evidence irrelevant and prejudicial, but, while requiring a new trial on damages against the defendant whom the jury held liable, did not order a new trial against the defendant whom the jury found not liable. Possibly the result would have been different had the jury acquitted both defendants.
[13] Annot., 77 A.L.R.2d 1154 (1961); Eichel v. New York Cent. R.R., 375 U.S. 253, 255, 84 S.Ct. 316, 317, 11 L.Ed.2d 307, 309 (1963). The United States Supreme Court, in Eichel, sustained a district court's holding that evidence of Railroad Retirement Act disability pension payments was inadmissible at the trial of claimant's action against the railroad under the Federal Employers' Liability Act. The Court did not deny that the evidence may have had some relevance, but said the likelihood of misuse outweighed that possible value; that other evidence could be obtained as proof of the same relevant fact; and that admitting the collateral source evidence would violate the spirit of the statute affording disability benefits.
[14] The court also said in Cook that "the evidence was presumably considered without qualification as bearing on a basic fact essential to liability." 277 So.2d at 850. The literal accuracy of that statement is difficult to prove from the facts appearing in the opinion; how social security and workers' compensation benefits bear on "a basic fact essential to liability" in a medical malpractice case does not readily appear. The quoted language evidently was taken from the Supreme Court's opinion in Tipton v. Socony Mobil Oil Co., 375 U.S. 34, 37, 84 S.Ct. 1, 3, 11 L.Ed.2d 4, 6 (1963), mentioned in Eichel, text at note 3, and decided earlier in the same term. In Tipton the claimant's acceptance of benefits under the Longshoremen's and Harbor Workers' Compensation Act was literally relevant to "a basic fact essential to liability" under the Jones Act, that claimant was a seaman and not an off shore drilling employee.